***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission adopts with minor modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement dated 8 April 1999 which is incorporated herein by reference, and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Defendant was a duly qualified self-insured, with Tynet as the servicing agent.
3. The employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff's average weekly wage was $499.23, which yields a compensation rate of $332.82 per week.
5. Plaintiff last worked for defendant on 15 September 1996.
6. The parties stipulated medical reports into the record of:
a. Dr. William Bell
b. Dr. Francisco Navarro
c. Dr. James Gardener
d. Dr. Dennis Payne
e. Dr. Nancy Morewitz
 ***********
Based upon all of the competent evidence adduced from the record, and the reasonable inferences therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was employed as a long distance truck driver for Tyson Foods. She and her husband were team drivers. On 2 September 1995, plaintiff and her husband were driving as a team to California. In Arkansas, plaintiff lifted a sleeper bunk and developed sudden pain in her neck and upper back. Her husband drove the rest of the way to California.
2. In California plaintiff sought treatment from a chiropractor who took x-rays and told her she had a back strain and that she should see her gynecologist for examination of the left breast implant in that there were calcifications around the implant. Plaintiff reported she was unable to ride back from California and defendant-employer flew her back to North Carolina. Defendant began temporary total disability payments on 4 September 1995, pursuant to a Form 21 Agreement for Compensation for Disability which was approved by the Commission on 2 May 1996.
3. Plaintiff was initially treated by James W. Serene, M.D. an orthopedist in Statesville, North Carolina. She was diagnosed as having a back strain and was released to return to work on 18 September 1995, with no lifting greater than 10 pounds until 2 October 1995, at which time she was released to return to her regular job with no restrictions. Dr. Serene did not believe plaintiff sustained a major injury or that there would be any permanent partial disability.
4. Plaintiff was unhappy with Dr. Serene and chose to be treated by Dr. Nancy Morewitz, a neurologist with Piedmont Neurological Consultants in Conover, North Carolina. Defendant subsequently authorized plaintiff's treatment with Dr. Morewitz. On 21 September 1995, plaintiff presented to Dr. Morewitz with complaints of headaches, involuntary movements and neck pain. Based upon the absence of symptoms prior to plaintiff's injury of 2 September 1995, Dr. Morewitz opined that plaintiff's condition was work related. Dr. Morewitz examined plaintiff and ordered an MRI of the brain which was normal. Dr. Morewitz initially wrote a note releasing plaintiff to return to work on 3 October 1995; however, due to plaintiff's complaints of continuing pain, Dr. Morewitz took her out of work through the next scheduled appointment on 24 October 1995 and again from 24 October until 5 December 1995. On 5 December 1995, Dr. Morewitz prescribed physical therapy and ultrasound treatments to plaintiff's neck and back and continued her out of work until 21 December 1995. By 21 December 1995, plaintiff reported that the therapy had provided substantial relief from her pain and she was not taking any pain medication and was only taking a muscle relaxant. She was released to return to work by Dr. Morewitz.
5. Plaintiff returned to work as a truck driver on 26 December 1995, and her temporary total disability compensation was stopped. A Form 28B Report of Employer of Compensation and Medical Compensation Paid was filed on 9 January 1996.
6. Plaintiff returned to Dr. Morewitz on 17 January 1996, claiming she was not able to work because the bouncing maneuvers of the truck exacerbated her neck pain. Dr. Morewitz took plaintiff out of work through 7 February 1996 and restarted plaintiff's physical therapy program. Defendant reinstated temporary total disability benefits on 17 January 1996 and filed a Form 28 Return to Work on 8 February 1996.
7. On 29 February 1996, Dr. Morewitz wrote plaintiff out of work for an additional 3 months; however, on 7 March 1996, Dr. Morewitz approved a light duty chicken filleting position offered by defendant and was of the opinion that plaintiff could begin work on 11 March 1996. On 18 March 1996, Plaintiff returned to work at the roast plant to a job wherein she was required to remove the cooked meat from chicken breasts halves. Plaintiff worked approximately 2 hours on 18 March. She did not return to work the next day because she had a dentist appointment, and on 20 March she worked approximately 2 hours and complained that her symptoms had increased. Plaintiff returned to Dr. Morewitz on 21 March 1996, at which time Dr. Morewitz took her out of work again through 4 April 1996 to allow time for a Functional Capacity Evaluation to be completed. Defendant paid plaintiff temporary partial disability compensation when she returned to work on 18 March 1996 and reinstated temporary total disability compensation on 21 March 1996 after Dr. Morewitz took her out of work.
8. The FCE revealed that plaintiff demonstrated a tolerance within a sedentary to light category of physical demands. Dr. Morewitz continued plaintiff out of work for an additional three months during which she recommended that plaintiff be evaluated at a Pain Management Clinic. Plaintiff was evaluated by Drs. Aronoff and Markey at the Pain Management Clinic in Charlotte, North Carolina. They recommended participation in the program and physical therapy.
9. On 5 August 1996, plaintiff had a team medical evaluation at Burke Rehabilitation Program. Prior to being admitted to the program she completed the interview sheet. Under the section "critical job demand" plaintiff wrote that as truck drivers they occasionally unloaded boxes weighing 1 to 50 pounds, that a tow motor and a motorized pallet jack were available for this task but that her husband performed it; that she drove with her husband as a team, 5 to 6 hours per person switching on and off; that she broke down pallets very infrequently, maybe once a year; and that she hooked up air and brake lights.
10. Dr. Peter Johnson, a consultant with the Burke Rehabilitation Program, examined plaintiff and diagnosed her as having regional neck pain, generalized deconditioning, sleep disturbances and headaches. Based upon this examination and the functional capacity evaluation plaintiff was admitted into the rehabilitation program, which consisted of a half-day of work hardening program five days per week, a full body therapeutic exercise program, psychosocial testing and individual and group sessions and dietary evaluations.
11. Plaintiff participated in the program every day, and the weekly team conference notes indicate that her symptoms had decreased and her complaints were minimal to non-existent. At the 27 August 1996 team conference, Dr. Johnson noted that plaintiff had fair motivation to return to work as a truck driver, but poor motivation to return to work in the plant. An onsite job evaluation was completed to evaluate the truck and the truck driving job. A functional capacity was subsequently completed which showed that plaintiff's physical abilities matched the job description from the site evaluation with the exception of hooking and unhooking the trailer and adjusting the trailer tandem.
12. On 3 September 1996, Dr. Johnson examined plaintiff and released her to return to work as a truck driver with the sole limitation of "no offloading the truck and would require assistance in pulling the locking pin from under the tractor trailer connection." He recommended for the first trip only that plaintiff drive 1,000 miles or less in each direction and that she use an air suspension seat and use a detachable lumbar support which she was given at the rehabilitation center. She was given a prescription for Vistoril and instructed to take no more than 25 milligrams 4 times a day and Ambien after which she was not to drive for a period of 8 hours. These were the only medications plaintiff was to take and Dr. Johnson explained to plaintiff the dosage and the reasons for the prescriptions. He also discussed with plaintiff her physical restrictions.
13. Plaintiff returned to work on or about 15 September 1996. Defendant completed a Form 28T and stopped temporary total disability compensation payments. Plaintiff and her husband were dispatched to drive from Wilkesboro to Charleston, West Virginia. Plaintiff began driving, but testified she was only able to drive for approximately 1 hour and then her husband had to complete the trip by himself. Plaintiff's son came and picked her up and drove her back home.
14. Plaintiff returned to Dr. Johnson on 17 September 1996 with complaints of headaches and difficulty sleeping. She discussed the attempted return to work, and stated that she was unable to do the truck driving job because of too much pain. Dr. Johnson found that plaintiff had demonstrated the physical capacity to perform the essential features of the truck driving job following her participation in the work hardening program, and that she had no change in this condition. He recommended that she return to work driving a truck with the same restrictions. Dr. Johnson assigned a 2.5% permanent partial disability rating to plaintiff's back and opined that she was at maximum medical improvement. He did not complete a Form 28U or take her out of work or modify her restrictions.
15. On 17 October 1996, plaintiff was examined by neurosurgeon Dr. William O. Bell. His examination revealed that plaintiff's back was normal and that she was in no acute distress. Dr. Bell diagnosed plaintiff as having a mid to upper thoracic strain with primarily a soft tissue injury and discharged her to return as needed. She did not return to Dr. Bell for further medical treatment.
16. Dr. Johnson examined plaintiff on 31 December 1996, and again in April, June and July 1997. On each of these occasions he reiterated his opinion that plaintiff did not have a change in condition or a new condition, and on each of these occasions he informed her orally and in writing that she could return to work and that there was no change in her return to work capacity. On 8 July 1997, Dr. Johnson discharged plaintiff with no change in her impairment rating and suggested that she have her family doctor follow up with the medications.
17. After Dr. Johnson left Burke Rehabilitation Center, plaintiff was followed by Dr. Harold Imbus. Dr. Imbus' opinions following his examinations of plaintiff were consistent with those of Dr. Johnson. Dr. Imbus concurred with Dr. Johnson regarding restrictions on plaintiff's medications and driving. Dr. Imbus did not take plaintiff out of work or modify her restrictions or complete a Form 28U.
18. On 23 April 1998, plaintiff sought unauthorized treatment from Dr. Francisco A. Navarro at the Pain Control Center at North Carolina Baptist Hospital. Dr. Navarro concurred with the treatment that plaintiff had received and informed her that there was nothing more that he could add to the treatment.
19. On 30 June 1998, plaintiff was evaluated by Dr. Robert L. Liljeberg, a board certified orthopedic surgeon to determine eligibility for Social Security Disability Benefits. Dr. Liljeberg's medical records and testimony indicate that her physical examination was normal; that she had no objective basis for her subjective complaint, that she had a multitude of complaints that were highly exaggerated. Dr. Liljeberg also testified that plaintiff's present symptoms could be coming from a foreign body reaction from her breast implant.
20. Plaintiff sought unauthorized treatment by rheumatologist Dr. Dennis Payne on May 5, 1999. Dr. Payne diagnosed plaintiff with inflammatory arthritis that was consistent with evolving rheumatoid arthritis and which was not caused by her injuries. He did not provide work restrictions for plaintiff on that date. On 16 June 1999, due to plaintiff's inflammatory arthritis, Dr. Payne restricted plaintiff's driving to no more than 20 continuous minutes for three months.
21. In May 1996, Joanne Z. Hartley, a registered nurse, certified case manager and member of the American Board of Disability Analyst, was retained by defendant as a medical case manager for plaintiff's claim. As part of her job duties, Ms. Hartley met with plaintiff and plaintiff's physicians and coordinated various appointments. Plaintiff informed Ms. Hartley that she and her husband worked as team drivers and drove up to 70 hours a week. When Ms. Hartley asked her about loading and unloading the trucks Plaintiff stated, "no they did not have to do that rarely and there was a power jack available or a tow motor to assist with that but usually she did not do any loading or unloading in that her husband did all of that." Plaintiff also informed Ms. Hartley that she was not going to return to work at Tyson in any capacity other than as a truck driver. Defendant-employer informed Ms. Hartley that they would find and provide plaintiff with a position within one of the plant facilities that would meet whatever restrictions plaintiff's doctor assigned to her.
22. Defendant-employer regularly employs team drivers and when spouses work together the male routinely takes over the more strenuous activities.
23. Defendant-employer offered plaintiff her pre-injury job of team truck driver on 15 September 1996. David Locklear is defendant-employer's terminal manager and is plaintiff's supervisor. On 30 September 1999, plaintiff informed Mr. Locklear that she did not believe she could drive the truck and asked Mr. Locklear what she could do. Mr. Locklear informed her that he had to go by the doctor's restrictions which said she could drive the truck but that she was welcome to seek alternate employment within the company such as working at the plant. Plaintiff told Mr. Locklear that she was not going to work at the plant, that she was hired as a truck driver and that was all she was going to do.
24. Despite being offered suitable employment as a truck driver or some other suitable job within defendant-employer's plant, plaintiff never attempted to return to work at defendant-employer or for any other employer.
25. Plaintiff's refusal to return to the job of team truck driver for defendant-employer or to accept alternate employment was unjustified and unreasonable. No authorized doctor ever changed plaintiff's work restrictions or stated that the truck driver's job was no longer suitable.
26. Drivers may drive up to a maximum of 10 hours and then must be off duty for 8 hours. Drivers can split the driving any way they desire, such as 8 hours driving and 8 hours off or 6 hours on and 6 off. Under the Federal Regulations there is no reason why plaintiff cannot take the Ambien as directed and have the other team driver drive for 8 hours. The restrictions of no offloading trucks and the need for assistance in pulling out the locking pin are not restrictions on plaintiff's driving under the Federal Motor Carrier Regulation.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident arising out of and in the course of the employment on 12 September 1995, for which defendant accepted liability and paid temporary total disability compensation benefits until 15 September 1999. N.C. Gen. Stat. § 97-2(6).
2. On or about 15 September 1999, plaintiff was offered suitable employment by defendant-employer. Plaintiff's refusal of the suitable employment was unjustified; therefore she is not entitled to any further compensation during the continuance of such refusal. N.C. Gen. Stat. § 97-32.
3. Plaintiff is entitled to have defendant pay for such medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. § 97-2(19).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for additional compensation for her compensable back injury subsequent to 15 September 1999, must be and is hereby suspended for so long as plaintiff continues to unjustifiably refuse suitable employment.
2. Defendant shall pay medical expenses incurred or to be incurred when bills for the same have been approved, in accordance with the provisions of the Act.
3. Defendant shall pay the costs.
This the ___ day of December, 2001.
 S/_____________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_________________ LAURA K. MAVRETIC COMMISSIONER
 S/________________ RENE C. RIGGSBEE COMMISSIONER